IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. ELH-13-479 |
| RODNEY BUSH,<br>*Defendant.* | |

**MEMORANDUM OPINION**

Rodney Bush, through counsel, has filed an "Emergency Motion For Compassionate Release Pursuant To 18 U.S.C. § 3582(c)(1)(A)(i)." ECF 81 (the "Motion"). The Motion is supported by two exhibits. ECF 81-1; ECF 81-2. The government opposes the Motion (ECF 82) and has submitted multiple exhibits, including defendant's extensive medical records. ECF 82-1 to ECF 82-4; ECF 84 (sealed); ECF 84-1 to ECF 84-6. Defendant has replied (ECF 86) and submitted one additional exhibit. ECF 88.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

### I. Background

On September 10, 2013, a grand jury sitting in the District of Maryland returned an indictment against Bush and one codefendant, Jacqueline Isaacs, with whom defendant was romantically involved. ECF 1; ECF 44 ("Plea Agreement") at 10. Bush was charged with five counts of Bank Robbery (Counts One, Two, Three, Four, and Six), in violation of 18 U.S.C. §2113(a) & (f), and with one count of Conspiracy to Commit Bank Robbery (Count Five), in violation of 18 U.S.C. § 371. ECF 1.

Bush entered a plea of guilty to all six counts on February 12, 2014. ECF 43. The plea was tendered pursuant to a plea agreement. ECF 44. In the Plea Agreement, Bush admitted to

the commission of two additional bank robberies, which were treated "as if the defendant had been convicted of additional counts charging those offenses." *Id.* ¶ 7(a).

The government agreed to recommend a reasonable sentence. *Id.* ¶ 11. And, the defendant agreed to pay restitution of $36,726. *Id.* ¶ 13.

The Plea Agreement included a stipulation of facts. *See* ECF 44 at 10-13. According to the stipulation, from December 2012 until July 2013, Bush committed seven bank robberies "through use of written and verbal demands." *Id.* The facts of each robbery are similar.

The last robbery occurred on July 17, 2013. *Id.* at 11. Bush drove to the PNC Bank in Glen Burnie, Maryland with his codefendant and the following ensued, *id.* at 11-12:

> . . . Bush entered the bank and made contact with the bank teller. Bush handed the teller a note that read, "This is A Robbery! Quickly place All of your 100, 50, and 20 dollar bills through the slot and your co-workers won't get shot! NO DYE Packs". During the robbery, Bush put his hands down towards his pants, causing the teller to believe that Bush was armed. Bush demanded money from the bottom draw and advised, "No dye packs." No weapon was displayed during the robbery. The teller, believing the defendant to be armed and in fear for her safety, surrendered $2,421.00 in U.S. currency from the teller drawers. The teller also provided Bush with a device concealed in the case, but Bush removed the device, demanded the return of the note, fled the bank, and entered the vehicle driven by Isaacs.

A high-speed police chase followed the robbery. It ended when the vehicle crashed into another vehicle. Both Bush and Isaacs, who was the driver, were arrested. *Id.* at 12. Bush has been in custody since that date, *i.e.*, July 17, 2013. ECF 81 at 2.

Sentencing was held on July 9, 2014. ECF 72. At the time of sentencing, the defendant was 46 years of age. The Presentence Report (ECF 53) reflected a final offense level of 28 (*id.* ¶ 93) and a Criminal History Category of III. *Id.* ¶ 127.

At the time Bush committed the robberies, he was on parole in Maryland for two armed robberies in 1999, for which he received concurrent sentences of 20 years, and for which he

2

served about eleven years. *Id.* ¶¶ 113-122.  The defendant had a total of six criminal history points.  ECF 53, ¶¶ 125-127.  Defendant also had eight other convictions between 1985 and 1995, including convictions for theft, distribution and possession with the intent to distribute narcotics, and a firearms conviction.  *See* ECF 53, ¶¶ 97-112, 123; ECF 68 (Government Sentencing Memorandum) at 8.  Those prior convictions did not score points, however.

Accordingly, with an offense level of 28 and a Criminal History Category of III, Bush's advisory sentencing guidelines (the "Guidelines" or "U.S.S.G.") called for a sentence ranging from 97 to 121 months of incarceration.  *Id.*  But, the government sought an above-Guidelines sentence of 180 months, "[i]n light of the number of robberies (some of which did not impact the guidelines), the defendant's 8 prior convictions that received no criminal history points, and the defendant's prior state sentence of 20 years' for 2 armed robberies with handguns." ECF 82 at 2; *see* ECF 68.

The Court imposed an above-Guidelines sentence of 125 months' imprisonment and three years of supervised release.  ECF 76 (Amended Judgment).  I explained in the Statement of Reasons (ECF 77): "[T]he guidelines did not adequately capture the factors under 18 U.S.C. § 3553(a), such as the seriousness of the offenses, the need to protect the public from the defendant, and to promote respect for the law.  In my view, a sentence of 125 months was generous and, in mitigation, took into account that the defendant has had a long struggle with drug addiction." *Id.* at 3.

Bush, who was born in July 1967 (ECF 53 at 2), is now 53 years of age.  ECF 88 (Summary Reentry Plan – Progress Report) at 1.  He has served approximately 86 months of his sentence, and is presently incarcerated at FCI Fort Dix in New Jersey, a low-security facility. ECF 81 at 1; ECF 88 at 1.  His projected release date is July 12, 2022.  ECF 88 at 1.

At the time of sentencing, Bush's medical history included hypertension, hypothyroidism, and Hepatitis C, as well as depression, anxiety, bipolar disorder, and alcoholism. ECF 81 at 2; ECF 53, ¶¶ 166, 170. While incarcerated, Bush has become prediabetic and has been diagnosed with hyperlipidemia. ECF 81 at 2. On June 1, 2020, Bush, through counsel, submitted a Request for Compassionate Release to the Warden of FCI Fort Dix. ECF 81 at 3. The Warden denied defendant's request on June 10, 2020. *Id.*; ECF 82-3.

The Bureau of Prisons ("BOP") denied defendant's request for compassionate release or reduction in sentence, citing his age and the view that he is not eligible for early release under Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205. *See* ECF 82-3. Additionally, the BOP explained that all of the defendant's medical conditions "are stable and controlled by medication or lifestyle changes." *Id.* The Motion followed on June 26, 2020. ECF 81.

Additional facts are included, *infra*.

## II.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only

upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

5

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13.

"When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, ___ F. App'x ___, 2020 WL 5412762, at * 1 (4th Cir. Sept. 9, 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." U.S.S.G. § 1B1.13(1)(A) provides for a sentence reduction based on "extraordinary and compelling reasons," and § 1B1.13(1)(B) provides for a sentence reduction based on age, in combination with other requirements. U.S.S.G. § 1B1.13(2) establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Application Notes permit compassionate release based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." Application Note 1 of U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows (emphasis added):

> 1. **Extraordinary and Compelling Reasons.**—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> **(A)  Medical Condition of the Defendant.**—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>  (I)  suffering from a serious physical or medical condition,
>
>  (II) suffering from a serious functional or cognitive impairment, or
>
>  (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious health issues, and has served at least 10 years in prison or 75% of his term of imprisonment. Application Note 1(C) concerns Family Circumstances. And, Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).

7

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. The Court may not rely on the Program Statement, however. Rather, the Court must consider the Sentencing Commission's policy statements. *Taylor*, 2020 WL 5412762, at * 1.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827. But, compassionate release is a "rare" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.    COVID-19[1]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, ___ F. Supp. 3d ___, 2020 WL 2556496, at *1 (D. Md. May 20, 2020). That crisis is COVID-19.[2] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

---

[1] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, ___ F. Supp. 3d ___, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). It "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, ___ Fed. App'x ___, 2020 WL 3100187 (6th Cir. June 11, 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses have reopened, many are still subject to substantial restrictions. And, in view of the recent resurgence of the virus, some businesses and schools are facing closure or restrictions.

Moreover, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted). As of September 9, 2020, COVID-19 has infected more than 6 million Americans and caused over 189,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Sept. 9, 2020).

Unfortunately, there is currently no vaccine, cure, or proven treatment that is available. Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, the CDC revised its guidance. Then, on July 17, 2020, to reflect the most recently available data, the CDC again revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (July 17, 2020), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD") a compromised immune system from solid organ transplant; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; and Type 2 diabetes.

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include moderate to severe asthma, cerebrovascular disease, hypertension, pregnancy, liver disease, cystic fibrosis, pulmonary fibrosis, neurologic conditions, a compromised immune system, smoking, and Type I diabetes. *See id.* To illustrate, moderate to severe asthma is an underlying medical condition that was moved to the new category by the CDC; it is now identified as a condition that "might" put an individual at higher risk for COVID-19 complications. *See id.*

10

Notably, the CDC cautions that the "more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 21, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see also Cameron*, 2020 WL 2569868, at *1. They are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers. Indeed, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the

11

position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Moreover, Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. *See* ECF 84-5; ECF 84-6 (declarations detailing measures that BOP has implemented at BOP facilities). Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[3] As of September 14, 2020, the BOP had 126,754 federal inmates and 36,000 staff. Also as of that date, the BOP reported that 1,930 inmates and 636 BOP staff currently tested positive for COVID-19; 11,476 inmates and 1,045 staff have recovered from the virus; and 119 inmates and two staff members died from the virus. And, the BOP has completed 45,418 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed September 14, 2020). *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FCI Fort Dix, where the defendant is a prisoner, as of September 17, 2020, the BOP reported that no inmates have currently tested positive for COVID-19 and 36 inmates have recovered, with no fatalities. And, the facility has completed 461 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Sept. 17, 2020).

### IV. Discussion

Bush seeks a reduction of his sentence to time-served under 18 U.S.C. § 3582(c)(1)(A)(i), on the grounds that "his multiple chronic medical conditions, together with his age, race, and gender make him highly vulnerable to COVID-19" and constitute an "extraordinary and compelling reason" for his release. ECF 81 at 5. In particular, Bush avers that he "has at least three chronic medical conditions that have been widely recognized as significant risk factors for COVID-19: hypertension, hyperlipidemia, and prediabetes." *Id.* at 9; *see* ECF 84-4 (Medical Records). Further, defendant contends that he is not a danger to the community and that the factors under 18 U.S.C. § 3553(a) favor release. *Id.* at 15-18.

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2.

The government opposes Bush's Motion at each step of the analysis. First, the government contends that Bush is ineligible for release because he "attempts to shoehorn [the three medical conditions] into actual CDC risk factors for contracting COVID." ECF 82 at 9-10. The government argues that hypertension is merely a condition that "**might** cause an increased risk for severe illness." *Id.* at 10 (quoting CDC guidelines) (emphasis in government brief). In addition, it argues that defendant's other two conditions—hyperlipidemia and prediabetes—are not additional risk factors and have not compromised defendant's immune system in any way. *Id.* at 12-13. Moreover, the government notes that the defendant has had hypertension since 2008, but it is treated with medication and the condition is under control. *Id.* at 11.

As to defendant's high cholesterol and prediabetes, the government contends that these conditions are not even specified by the CDC as factors that might cause an increased risk of severe illness due to COVID-19. *Id.* at 12. And, it points out that the conditions are under control. *Id.* In its view, the defendant's medical records demonstrate that these conditions have had "no impact on the defendant's lifestyle or health . . . ." *Id.* Therefore, release based on these conditions would, according to the government, result in "watering down the [CDC] guidelines to cover any form of a designated medical condition. . . ." *Id.*

The government also asserts that Bush is ineligible for release because he is a danger to the community. *Id.* at 14-16. And, the government maintains that the § 3553(a) factors militate against reducing his sentence. *Id.*

Defense counsel has cited a recent study, published in the Journal of the American Medical Association ("JAMA"), which found that among 5700 patients in New York City who were hospitalized with COVID-19, the most common underlying medical conditions were hypertension (56.6 percent), obesity (41.7 percent), and diabetes (33.8 percent). *See* Safiya

14

Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020). And, a similar study of Italian patients admitted to the hospital who later died from COVID-19 revealed that hypertension was the most common pre-existing health condition, which was detected in 68 percent of patients who died after contracting the virus. *See* Statista Research Department, *Most common comorbidities observed in coronavirus (COVID-19) deceased patients in Italy as of May 2020*, Statista (May 19, 2020). Indeed, Judge Chuang recently stated in a case involving a motion for release pending sentencing: "As of March 2020, three-fourths of individuals who died from COVID-19 in Italy had hypertension." *United States v. Keaton*, TDC-18-215, ECF 84 at 5 (D. Md. Apr. 23, 2020) (citing *Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *1 (D. Md. Apr. 3, 2020)).

Of import here, however, according to the Mayo Clinic, people with untreated high blood pressure are more at risk of complications from COVID-19 than those whose high blood pressure is under control and managed by medication. *See COVID-18 and High Blood Pressure: Am I at Risk?*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663 (last visited Sept. 9, 2020). And, as noted, Bush has regularly taken blood pressure medication while in the BOP to manage his condition, and the condition is under control. ECF 81 at 8; ECF 84-2 (Medical Summary) at 2.

But, in addition to hypertension, Bush has other comorbidities that may aggravate his vulnerability to COVID-19, including prediabetes, hyperlipidemia, hypothyroidism, and Hepatitis C. *See* ECF 81 at 8. Numerous courts have found that, in light of the COVID-19 pandemic, serious chronic medical conditions, including hypertension (and advanced age), qualify as a compelling reason for compassionate release. *See, e.g., United States v. Gutman*,

15

RDB-19-0069, 2020 WL 2467435, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, ___ F. Supp. 3d ___, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity constituted an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason). *But see United States v. Wright*, Nos. TDC-17-388, TDC-19-35, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) (denying compassionate release to defendant with diabetes, hypertension, chronic kidney disease, asthma, and obesity); *United States v. Barringer*, PJM-13-0129, 2020 WL 2557035, at *4 (D. Md. May 19, 2020) (denying compassionate release to defendant with hypertension, diabetes, chronic kidney disease, and extreme obesity).

Accordingly, I conclude that Bush has presented medical conditions that constitute an "extraordinary and compelling" reason to reduce his sentence under §3582(c)(1)(A)(ii).

However, there were no confirmed cases of COVID-19 among inmates at Ft. Dix as of September 17, 2020. Thus, although the presence of COVID-19 within a prison is not a necessary prerequisite for release, and an outbreak could occur at any time, the fact that there are no cases at Ft. Dix reduces the imminence of the risk of harm to Bush.

I next consider whether, if released, Bush would pose a danger to the community. The government urges that conclusion, citing the seriousness and numerosity of his offenses in this case—seven bank robberies over the course of seven months—and the defendant's prior criminal history of multiple convictions. ECF 82 at 14-15. The government also argues that defendant's drug use continues to make him a serious threat to the community, noting that he tested positive for opioids during a random drug screen on March 6, 2020. *Id.* at 16; ECF 84-1 (Disciplinary Record).

Bush acknowledges the seriousness of the crimes at issue here. ECF 81 at 15. But, he argues that they were the product of his drug addiction, and he claims that he is no longer a danger to the community. ECF 81 at 15; ECF 86 at 8. He also points to "the vast body of post-sentencing rehabilitative efforts" that he has taken and his "strong and stable release plan." ECF 86 at 8. Further, Bush contends that another 24 months in prison will not diminish the risks associated with his drug addiction. *Id.* at 9. Rather, he asserts that he "would be better off in the community," where he would have "access to intensive substance abuse treatment." *Id.*

As I see it, the sentencing factors under 18 U.S.C. § 3553(a) do not weigh in favor of reducing Bush's sentence. These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the

17

applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The gravity of the crimes in this case is significant. Moreover, Bush's prior record is a factor that is relevant to the analysis. From ages 18 to 31, he amassed 10 convictions. ECF 82 at 2. Most troubling, in 1999 he received concurrent 20-year sentences for a pair of armed robberies. *Id.* at 15. He served about eleven years of imprisonment for those offenses. Yet, that lengthy sentence, with "back up" time of nine years, did not deter defendant from the commission of the bank robberies that led to his federal prosecution. Indeed, only two years after completion of the sentencing, and while defendant was still on parole, he committed the seven robberies in this case. And, the defendant's sentence here of 125 months of imprisonment is less than the eleven years he previously served.

As I observed at Bush's sentencing, "a sentence of 125 months was generous" in light of the number of robberies the defendant committed and his criminal history. ECF 77. And, the defendant has only served about 86 months of that sentence.

Even if Mr. Bush's criminal conduct was the "product of his drug addiction," as Bush avers (ECF 81 at 15), his recent use of narcotics (ECF 84-1) does not instill confidence in the Court that he is no longer a danger to the community. That said, the Court applauds Bush's rehabilitative efforts. I am mindful that he has completed educational courses and vocational training. ECF 81 at 16. In particular, he completed almost 3,500 hours of an HVAC apprenticeship and enrolled in college classes. *Id.* He even took course work in Spanish. *Id.* at 17. At Ft. Dix, he has worked in the kitchen and completed a Commercial Driver's License course. *Id.* These accomplishments are noteworthy.

Given the facts of Bush's offense, coupled with his prior criminal history, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time. But, **nothing in the Memorandum Opinion is meant to dissuade the BOP from releasing Bush to home confinement, pursuant to 18 U.S.C. § 3642(c).**

### V.    Conclusion

For the forgoing reasons, I shall deny the Motion (ECF 81), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date:   September 18, 2020

/s/
Ellen Lipton Hollander
United States District Judge